# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

```
_____
                                )
THE LOAN SYNDICATIONS AND        )
TRADING ASSOCIATION,             )
                                 )
                Plaintiff,       )
                                 )
v.                               )    Civil Action No. 16-652 (RBW)
                                 )
SECURITIES AND EXCHANGE          )
COMMISSION and BOARD OF          )
GOVERNORS OF THE                 )
FEDERAL RESERVE SYSTEM,          )
                                 )
                Defendants.      )
_____)
```

## MEMORANDUM OPINION

The plaintiff, the Loan Syndications and Trading Association, "a not-for-profit trade association representing members participating in the syndicated corporate loan market," Plaintiff's Motion for Summary Judgment ("Pl.'s Mot"), Exhibit ("Ex.") A (Opening Brief of Petitioner ("Pet'r's Br.")) at iii, brings this action against the defendants, the Securities and Exchange Commission ("SEC") and the Board of Governors of the Federal Reserve System (the "Board"), seeking review of the final rules adopted by these and other agencies pursuant to Section 941 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.  Complaint ("Compl."), Ex. A (Petition for Review) at 1.  Currently before the Court are the Plaintiff's Motion for Summary Judgment and the Defendants' Motion for Summary Judgment ("Defs.' Mot.").[1]  After carefully considering these motions and the Administrative Record ("A.R."), the

---

[1] The plaintiffs originally filed this action in the District of Columbia Circuit.  See Judgment (Mar. 18, 2016), ECF No. 1.  After the case was transferred to this Court, the Court issued an order granting the parties' joint request to file their appellate briefs as motions for summary judgment.  See Minute Order, Apr. 18, 2016.

Court concludes for the reasons that follow that it must deny the plaintiff's motion and grant the defendants' motion. [2]

# I.     BACKGROUND

## A.     The Dodd-Frank Act

This case concerns the Office of the Comptroller of the Currency's, the Board of Governors of the Federal Reserve System's, the Federal Deposit Insurance Corporation's, and the SEC's ("the agencies'")[3] joint implementation of an amendment to the Securities Exchange Act of 1934, added by Section 941 of the extensive Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act").  See Pub. L. No. 111-203, § 941, 124 Stat. 1376 (2010) (codified at 15 U.S.C. § 78o-11 (2012)).  This amendment requires the agencies to "jointly prescribe regulations to require any securitizer to retain an economic interest in a portion of the credit risk for any asset that the securitizer, through the issuance of an asset-backed security, transfers, sells, or conveys to a third party."[4]  15 U.S.C. § 78o-11(b)(1).  Congress defined a "securitizer" as: "(A) an issuer of an asset-backed security; or (B) a person who organizes and initiates an asset-backed securities transaction by selling or transferring assets, either directly or indirectly, including through an affiliate, to the issuer."  Id. § 78o-11(a)(3).  Congress further directed the agencies to require that securitizers retain "not less than [five]

---

[2] In addition to the filings already identified, the Court considered the following documents in rendering its decision: (1) the Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Opp'n"); (2) the Plaintiff's Opposition to Defendants' Cross-Motion for Summary Judgment and Reply in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Reply"); (3) the Brief for the Chamber of Commerce of the United States of America as Amicus Curiae Supporting Petitioner ("Pl.'s Amicus"); and (4) the Brief of Better Markets, Inc. as Amicus Curiae in Support of Respondents Securities and Exchange Commission and Board of Governors of the Federal Reserve System ("Defs.' Amicus").

[3] The SEC and the Board are the only agency defendants named in this matter because the plaintiff only challenges the rules adopted by these two entities.  See Pl.'s Mot., Ex. A (Pet'r's Br.) at i.

[4] The statute also requires the Secretary of Housing and Urban Development and the Federal Housing Finance Agency to join the four agencies identified above in jointly prescribing regulations regarding the securitization of any residential mortgage asset.  15 U.S.C. § 78o-11(b)(2).

percent of the credit risk", id. § 78o-11(c)(1)(B)(i), for all applicable assets, and to "establish appropriate standards for retention of an economic interest with respect to collateralized debt obligations, securities collateralized by collateralized debt obligations, and similar instruments collateralized by other asset-backed securities," id. § 78o-11(c)(1)(F).  In addition, the agencies are permitted to provide "total or partial exemption[s]" for securitizations "as may be appropriate in the public interest and for the protection of investors."  Id. § 78o-11(c)(1)(G).

## B.      Open Market Collateralized Loan Obligations

The core of this case concerns the operation of the term "securitizer" and the corresponding joint regulation issued by the agencies to implement the credit risk retention mandate in relation to the entities and processes associated with collateralized loan obligations ("CLOs").  As the Court understands from the parties' filings, a CLO is a type of securitization or asset-backed security, backed by loans that are typically made from banks to commercial borrowers with low credit ratings or large debt obligations.  See Pl.'s Mot., Ex. A (Pet'r's Br.) at 2 ("CLOs are securitizations backed by large loans generally originated by the largest U.S. banks and provided to large commercial enterprises with relatively high levels of debt . . . ."); Defs.' Mot., Ex. A (Brief for Respondents ("Resp'ts' Br.")) at 5 ("A collateralized loan obligation . . . is a type of collateralized debt obligation . . . that is primarily backed by loans made to corporate borrowers without strong credit.").  The type of CLOs involved here are the so-called "open market CLOs."  Pl.'s Mot., Ex. A (Pet'r's Br.) at 7.

Open market CLOs "securitize assets purchased on the primary or secondary markets based on the CLO's particular investment guidelines."  Defs.' Mot., Ex. A (Resp'ts' Br.) at 5–6; see also Pl.'s Mot., Ex. A (Pet'r's Br.) at 7.  Open market CLOs are distinguished from "balance-sheet CLOs, which are instead designed by the owner of leveraged loans," Pl.'s Mot., Ex. A

(Pet'r's Br.) at 7, and "generally securitize loans already held in an institution's portfolio,
including assets it has originated," Defs.' Mot., Ex. A (Resp'ts' Br.) at 5.  Essentially, managers
of open market CLOs direct the purchase of loans in accordance with certain "investment
parameters" negotiated with investors, Pl.'s Mot., Ex. A (Pet'r's Br.) at 7, through a special
purpose vehicle, which is "formed expressly to issue the [asset-backed security]," Defs.' Mot.,
Ex. A (Resp'ts' Br.) at 6.  An open market CLO manager has a certain level of discretion in
selecting loans on the market and later "operates the CLO and manages its loan portfolio."  Pl.'s
Mot., Ex. A (Pet'r's Br.) at 8; <u>see also</u> Defs.' Mot., Ex. A (Resp'ts' Br.) at 6.

**C.      The Agencies' Rulemaking**

The dispute before the Court evolves from the agencies' decision to regulate open market
CLO managers pursuant to Section 941 of the Dodd-Frank Act.  The defendants, along with the
other relevant agencies identified earlier, <u>supra</u> at 2, issued a joint notice of proposed rulemaking
and solicited comments on the Dodd-Frank Act's credit risk retention provisions.  A.R. at
JA0176 (Credit Risk Retention, 76 Fed. Reg. 24090, 24090–91 (Apr. 29, 2011) (the "initial
proposed rule")).  In this initial proposed rule, "[t]he Agencies noted that the second prong of"
the statutory definition of "securitizer"[5] "is substantially identical to the definition of a 'sponsor'
of a securitization transaction in the [SEC's regulation] governing disclosures for [asset-backed
security] offerings registered under the Securities Act."  <u>Id.</u> at JA0184 (76 Fed. Reg. at 24098).
This pre-existing regulation defines "a 'sponsor' as a person who organizes and initiates an asset-
backed securities transaction by selling or transferring assets, either directly or indirectly,
including through an affiliate, to the issuing entity."  <u>Id.</u> at JA0184 (76 Fed. Reg. at 24098 n.40
(citing 17 C.F.R. § 229.1101 (2014))).  The agencies specifically noted that a "CLO manager

---

[5] "[A] person who organizes and initiates an asset-backed transaction by selling or transferring assets, either directly or indirectly, including through an affiliate, to the issuer . . . ." 15 U.S.C. § 78o-11(a)(3)(B).

generally acts as the sponsor by selecting the commercial loans to be purchased by an agent bank for inclusion in the CLO collateral pool, and then manages the securitized assets once deposited in the CLO structure." Id. at JA0184 (76 Fed. Reg. at 24098 n.42).  Accordingly, the agencies decided that the definition of "securitizer" included open market CLO managers, and thus these managers would be subject to the statute's credit risk retention mandate.  Id.

The agencies also proposed a "menu of options approach" with regard to the statute's credit risk retention mandate.  Id. at JA0187 (76 Fed. Reg. at 24101).  A securitizer could therefore satisfy its risk retention requirement under the proposed rules by either: (1) "retaining at least five percent of each class of [asset-backed security] interests issued as part of the securitization transaction" ("vertical risk retention"); (2) "retaining an 'eligible horizontal residual interest' in the issuing entity in an amount that is equal to at least five percent of the par value of all [asset-backed security] interests as part of the securitization transaction" ("horizontal risk retention"); (3) retaining risk through "an equal combination of vertical risk retention and horizontal risk retention" ("L-shaped risk retention"); or (4) retaining risk in accordance with several other approaches not relevant here.  Id. at JA0187–89 (76 Fed. Reg. at 24101–03).  The vertical risk retention option originally did not specify by what measurement the retention requirement would be satisfied "because the amount retained [in each class], regardless of method of measurement, should equal at least five percent of the par value (if any), fair value, and number of shares or units in each class."  Id. at JA0187 (76 Fed. Reg. at 24101).

The initial proposed rule garnered "comments from over 10,500 persons, institutions, or groups, including nearly 300 unique comment letters."  Id. at JA 1203, 1208 (Credit Risk Retention, 78 Fed. Reg. 57928, 57933 (Sept. 20, 2013) (the "modified proposed rule").  The agencies considered these comments, modified the original proposal, and requested comment on

the modified proposed rule.  Id.  In issuing these modified proposed rules, the agencies noted that

many commenters were concerned about how several of the original proposed rules would affect

open market CLOs.  Id. at JA 1208 (78 Fed. Reg. at 57933) ("Several commenters criticized

application of the original proposal to managers of certain collateralized loan obligation (CLO)

transactions and argued that the original proposal would lead to more concentration in the

industry and reduce access to credit for many businesses."); JA1236 (78 Fed. Reg. at 57961)

("Many commenters, including several participants in CLOs, raised concerns regarding the

impact of the proposal on certain types of CLO securitizations, particularly CLOs that are

securitizations of commercial loans originated and syndicated by third parties and selected for

purchase on the open market by asset managers unaffiliated with the originators of the loans

(open market CLOs).").  The agencies reaffirmed their interpretation that "the CLO manager is a

'securitizer'" under the statute and addressed various definitional concerns raised by the

comments.  Id. at JA1236–37 (78 Fed. Reg. 57961–62).  However, in recognizing that "the

standard forms of risk retention in the original proposal could, if applied to open market CLO

managers, result in fewer CLO issuances and less competition in this sector," the agencies

developed revised risk retention options "designed to allow meaningful risk retention to be held

by a party that has significant control over the underwriting of assets that are typically

securitized in CLOs, without causing significant disruption to the CLO market."  Id. at JA1237

(78 Fed. Reg. at 57962).  The modified proposed rules permitted securitizers "to combine the

horizontal, vertical, and L-shaped risk retention options into a single risk retention option with a

flexible structure . . . using fair value, determined in accordance with U.S. generally accepted

accounting principles."  Id. at JA1212 (78 Fed. Reg. at 57937).  In addition, the agencies

provided that "an open market CLO could satisfy the risk retention requirement if the firm

serving as lead arranger for each loan purchased by the CLO were to retain at the origination of the syndicated loan at least [five] percent of the face amount of the term loan tranche purchased by the CLO." Id. at JA1237 (78 Fed. Reg. at 57962).

After reviewing the second round of comments on the modified proposed rule, the agencies jointly adopted the final credit risk retention rule. Id. at JA2167 (Credit Risk Retention, 79 Fed. Reg. 77602, 77602 (Dec. 24, 2014) (to be codified at 17 C.F.R. pt. 246 and 12 C.F.R. pt. 244.) (the "final rule")). In adopting the final rule, the agencies again addressed comments concerning the inclusion of CLO managers under the definition of "securitizer," and reaffirmed their determination that the definition covered CLO managers. Id. at JA2218–20 (79 Fed. Reg. at 77653–55) ("[T]he agencies believe that the interpretation of 'securitizer' to include CLO managers is reasonable."). The agencies also adopted the use of fair value as a gauge for retained interest in the horizontal risk retention option, but decided in response to comments they received "not [to] require[ ] vertical interests to be measured using a fair value measurement framework" for both purely vertical holdings and combined partial vertical interests in a combination holding, because the agencies "were persuaded by commenters that such measurement is not necessary to ensure that the sponsor has retained [five] percent of the credit risk of the [asset-backed security] interests issued." Id. at JA2281 (79 Fed. Reg. at 77716). Thus, the final rules implemented (1) a purely vertical risk retention option that allows securitizers to retain the statute's absolute minimum amount of required risk, (2) the ability to mix and match horizontal and vertical holdings, and (3) an additional "lead arranger" retention option specifically for CLOs. Id. at JA2178, 2216 (79 Fed. Reg. at 77613, 77651). Finally, the agencies concluded that they "did not believe that it would be appropriate to exempt open market

CLOs from the risk retention requirement" and thus declined to create such an exemption or adjustment for them.  Id. at JA2221 (79 Fed. Reg. at 77656).

D.     **Procedural History**

The plaintiff filed a petition for judicial review of the final rules in the United States Court of Appeals for the District of Columbia Circuit.  See Loan Syndications & Trading Ass'n v. SEC, 818 F.3d 716, 719 (D.C. Cir. 2016).  Following a show cause order and oral arguments on the jurisdictional question and merits of the petition, the District of Columbia Circuit determined that it lacked jurisdiction and transferred the case to this Court.[6]  Id.

The parties have now submitted for the Court's consideration the administrative record and the parties' appellate briefs as cross-motions for summary judgment.  The plaintiff argues that, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A)–(C),  the agencies, in their promulgation of the joint credit risk retention rules, arbitrarily and capriciously: (1) construed the term "securitizer" to include open market CLO managers, (2) required securitizers to retain a five percent interest based on fair value instead of "credit risk," and (3) declined to "exercise their exemption authority to permit open market CLO managers to retain credit risk at levels at or above the agencies' baseline level."  Pl.'s Mot., Ex. A (Pet'r's Br.) at 23–25

The defendants contend in response that none of the plaintiff's arguments have merit.  Defs.' Mot., Ex. A (Resp'ts' Br.) at 15.  The defendants argue that the statutory language does not exempt open market CLO managers from the definition of "securitizer" as the plaintiff

---

[6] The plaintiff's petition was filed with the District of Columbia Circuit in November 2014.  Unopposed Motion to Expedite Consideration of the Action and to Treat Appellate Briefs as Cross-Motions for Summary Judgment ("Mot. to Expedite") at 2.  With the regulations' compliance deadline in December 2016 looming, briefing at the District of Columbia Circuit was completed in July 2015, and oral arguments were scheduled to be heard seven months later. Mot. to Expedite at 2.  The opinion of the District of Columbia Circuit transferring the case to this Court was issued in March of 2016, leaving this Court with only nine months to consider the actual merits of the case before the compliance deadline.  Id.; see also Loan Syndications & Trading Ass'n, 818 F.3d at 718.

claims, and that the agencies' interpretation of "securitizer" is reasonable and entitled to deference under <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984).  Defs.' Mot., Ex. A (Resp'ts' Br.) at 16–17.  Next, the defendants argue that the agencies' approach to prescribing the five percent retention requirement is "hardly unreasonable or irrational" merely because the agencies may have taken a different approach than those espoused by the plaintiff.  Defs.' Mot., Ex. A (Resp'ts' Br.) at 18.  Finally, the defendants assert that they "carefully assessed" the statutory provisions and "reasonably concluded" that the "relevant considerations" did not support the plaintiff's proposed exemption or adjustments.  <u>Id.</u>

## II.     STANDARD OF REVIEW

Within the context of the APA, summary judgment is the mechanism for deciding whether an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review as a matter of law.  <u>See, e.g.</u>, <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 415 (1971).  The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness."  <u>FCC v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 513 (2009).  It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are either "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)–(C).  However, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).  Where Congress expressly delegates "authority to the agency to elucidate a specific provision of the statute by regulation, . . . any ensuing regulation is binding in the courts

unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." United States v. Mead Corp., 533 U.S. 218, 227 (2001).  Nonetheless, the agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).  Courts "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Pub. Citizen, Inc. v. FAA, 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)).

### III.    ANALYSIS

#### A.    Open Market CLO Managers as "Securitizers"

The plaintiff asserts that the statutory term "securitizer" should not include managers of open market CLOs.  Pl.'s Mot., Ex. A (Pet'r's Br.) at 27.  Because the plaintiff's arguments on this issue concern the agencies' construction of the Dodd-Frank Act and the reasonableness of the agencies' definition, the Court must first determine whether the Chevron framework governs the Court's analysis.  See Lewis v. Sec'y of Navy, __ F. Supp. 3d __, __, Civ. No. 10-0842, 2016 WL 3659882, at *4 (D.D.C. 2016) (Walton, J.) (noting generally, "where agency action turns on questions of statutory interpretation, courts must utilize the two-step process established in Chevron" (citing Chevron, 467 U.S. at 842)).  The Court concludes that (1) the two-step test under Chevron is appropriate to apply as a substantive standard for reviewing the agencies' construction of the statute; (2) Congress did not unambiguously foreclose the agencies' construction; and (3) the agencies' construction is reasonable.

1.      **Applicability of the** <u>**Chevron**</u> **Framework**

Generally, claims contesting "an agency's construction of a statute administered by that agency" warrant application of the two-step framework adopted in <u>Chevron</u>.  <u>See</u> <u>United States v. Alaska</u>, 503 U.S. 569, 575 (1992).  As a threshold determination, a court must consider whether "Congress would expect the agency to be able to speak with the force of law."  <u>Mead</u>, 533 U.S. at 229.  Next, a court considers under <u>Chevron</u> step one "whether Congress has directly spoken to the precise question at issue," and "[i]f the intent of Congress is clear, that is the end of the matter."  <u>Chevron</u>, 467 U.S. at 842.  But, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court [under <u>Chevron</u> step two] is whether the agency's answer is based on a permissible construction of the statute."  <u>Id.</u> at 843.  In other words, a court must "defer to the agency's interpretation of the statute if it is reasonable and consistent with the statute's purpose."  <u>Indep. Ins. Agents of Am., Inc. v. Hawke</u>, 211 F.3d 638, 643 (D.C. Cir. 2000) (citing <u>Nuclear Info. Res. Serv. v. Nuclear Regulatory Comm'n</u>, 969 F.2d 1169, 1173 (D.C. Cir. 1992) (en banc)).

The plaintiff contends that <u>Chevron</u> is not the appropriate framework to apply in considering the agencies' interpretation of the statutory definition of "securitizer" because "<u>Chevron</u> does not apply to agency interpretations of statutes . . . that are administered by multiple agencies."  Pl.'s Reply, Ex. A (Reply Brief of Petitioner ("Pet'r's Reply") at 9 (quoting <u>Benavides v. U.S. Bureau of Prisons</u>, 995 F.2d 269, 272 n.2 (D.C. Cir. 1993)).  The defendants respond that "<u>Chevron</u> deference does apply to the resolution of statutory ambiguity contained in joint regulations."  Defs.' Mot., Ex. A (Resp'ts' Br.) at 38 n.15 (citations omitted).  The Court agrees with the defendants.

11

Although it is true that the District of Columbia Circuit recognizes that "[j]ustifications for deference begin to fall when an agency interprets a statute administered by multiple agencies," DeNaples v. Office of Comptroller of Currency, 706 F.3d 481, 487 (D.C. Cir. 2013) (citing Bowen v. Am. Hosp. Ass'n, 476 U.S. 610, 642 n.30 (1986)), the plaintiff fails to recognize that the District of Columbia Circuit typically distinguishes between "generic statutes that apply to dozens of agencies, and for which no agency can claim any particular expertise," Collins v. Nat'l Transp. Safety Bd., 351 F.3d 1246, 1252 (D.C. Cir. 2003) (citations omitted), and "statutes where expert enforcement agencies have mutually exclusive authority over separate sets of regulated persons," id. at 1253. Central to this distinction and the broader justification for Chevron deference is a consideration of whether two bases for presuming implied delegation are present: "specialized agency expertise and the greater likelihood of achieving a unified view through the agency than through review in multiple courts." See id.; see also Bowen, 476 U.S. at 643 n.30 (concluding that a single agency's rulemaking did not command deference where twenty-seven agencies of varying fields of expertise separately "promulgated regulations forbidding discrimination on the basis of" disability in federal programs because the basis of expertise on which Chevron deference is predicated was absent).

The specter of diminished agency expertise and potentially discordant rules does not loom in this case because the statutory mandate at issue does not encourage differing interpretations by various agencies. Rather, the statute provides that "the Federal banking agencies and the [SEC] shall jointly prescribe regulations." 15 U.S.C. § 78o-11(b)(1) (emphasis added). Nothing in the Administrative Record suggests that the agencies did not fulfill the congressional mandate to jointly adopt uniform rules. See A.R. at JA2167 (79 Fed. Reg. at

77602) ("The OCC, Board, FDIC, [SEC], FHFA, and HUD . . . are adopting [this] joint final rule . . . .").

Because this case presents a situation in which six agencies with overlapping expertise were explicitly tasked by Congress to jointly draft and adopt regulations as part of a coordinated endeavor, this Court declines to conclude that Chevron is not applicable simply because more than one agency was involved in the rulemaking.  See Individual Reference Servs. Grp., Inc. v. FTC, 145 F. Supp. 2d 6, 24 (D.D.C. 2001) (holding that where "the subject matter of the statute falls squarely within the agencies' areas of expertise, and the Regulations were issued as a result of a statutorily-coordinated effort among the agencies, Chevron is the governing standard"), aff'd sub nom. Trans Union LLC v. FTC, 295 F.3d 42 (D.C. Cir. 2002); see also New Life Evangelistic Ctr., Inc. v. Sebelius, 753 F. Supp. 2d 103, 122–23 (D.D.C. 2010) (holding that "where multiple agencies are charged with administering a statute, a single agency's interpretation is generally not entitled to Chevron deference," but concluding that "there would be no comparable concern if all three agencies charged with administering the [statute in question] pressed the same interpretation before this Court").  Because this case concerns a single, unified rulemaking by six agencies with specialized expertise in the subject matter, the Court concludes that Chevron is the appropriate framework to apply in considering the plaintiff's arguments regarding the agencies' interpretation of the statutory definition of "securitizer."

Moreover, the Court is persuaded that "Congress would expect the agenc[ies] to be able to speak with the force of law," Mead, 533 U.S. at 229, because the Dodd-Frank Act explicitly tasked the agencies to "jointly prescribe regulations," 15 U.S.C. § 78o-11(b)(1).  Thus, the threshold Chevron determination is satisfied, and the Court therefore proceeds to Chevron step one.  See Mead, 533 U.S. at 229.

2.      **Chevron** **Step One**

Under <u>Chevron</u> step one, the Court must first consider whether Congress clearly intended

open market CLO managers to be excluded from the statute's definition of "securitizer."  <u>See</u> 15

U.S.C. § 78o-11(a)(3).  In applying step one, courts examine the statute's "text, structure,

purpose, and legislative history to determine if the Congress has expressed its intent

unambiguously."  <u>United States Sugar Corp. v. EPA</u>, 830 F.3d 579, 605 (D.C. Cir. 2016) (citing

<u>Bell Atl. Tel. Co. v. FCC</u>, 131 F.3d 1044, 1047 (D.C. Cir. 1997)).  Courts must first "focus on

the language of the statute."  <u>Bell Atl.</u>, 131 F.3d at 1047.  The plaintiff asserts that "[c]onstruing

and applying the term 'securitizer' should have been straightforward," Pl.'s Mot., Ex. A (Pet'r's

Br.) at 27, and argues that the agencies "disregard[ed] the precise statutory language Congress

used to define 'securitizer,'" <u>id.</u> at 29.  The Court is unpersuaded by this argument and concludes

that Congress did not unambiguously foreclose CLO managers from inclusion under the

statutory definition of "securitizer."

a.      **Congress's Broad Delegation of Authority**

The statute defines a "securitizer" as either "(A) an issuer of an asset-backed security; or

(B) a person who organizes and initiates an asset-backed securities transaction by selling or

transferring assets, either directly or indirectly, including through an affiliate, to the issuer."  15

U.S.C. § 78o-11(a)(3).  First, the Court notes that "Congress phrased the relevant provision

broadly [by] employing [the] words . . . 'directly or indirectly'" in the second prong of the

definition.  <u>See</u> <u>Ass'n of Private Sector Colls. & Univs. v. Duncan</u>, 681 F.3d 427, 444 (D.C. Cir.

2012) (describing "directly or indirectly" as "extremely broad language") (citing <u>Roma v. United</u>

<u>States</u>, 344 F.3d 352, 360 (3d Cir. 2003)).  Second, the definition's scope is not necessarily

restrictive because Congress employed the disjunctive "or" in joining both the (A) and (B)

prongs of the statutory definition.  See, e.g., Sabre, Inc. v. Dep't of Transp., 429 F.3d 1113, 1122

(D.C. Cir. 2005) ("Congress's use of 'principal' and 'agent' in the disjunctive does not

necessarily indicate that Congress intended to limit the broad applicability of the two

words. . . .  [T]he Department could permissibly identify an independent [computer reservation

system] as a 'principal or agent' in the broad sense of a travel intermediary.").  Third, the Court

notes that Congress explicitly exempted certain institutions and programs from the credit risk

retention requirement, see § 78o-11(e)(3)–(4) (exempting loans supervised by the Farm Credit

Administration, mortgages insured or guaranteed by the government, and qualified residential

mortgages); if Congress had not intended for open market CLO managers to be defined as

"securitizers" under the statute, it could have also included them in the list of exempted

institutions and programs, see, e.g., Monongahela Power Co. v. Marsh, 809 F.2d 41, 49 (D.C.

Cir. 1987) (stating that the omission of hydroelectric plants from the list of facilities exempted

from certain administrative requirements suggests that Congress intended that the requirements

would apply to hydroelectric plants).  Congress's use of the phrase "directly or indirectly," its

use of the word "or" as the connector of the definition's two prongs, and the failure to include

open market CLO managers as an exempted class indicate that the statutory definition of

"securitizer" was not unambiguously intended to exclude open market CLO managers from

credit risk retention.

  In the absence of statutory clarity, "the court may be forced to look to the general purpose

of Congress in enacting the statute and to its legislative history for helpful cues."  United States

v. Braxtonbrown–Smith, 278 F.3d 1348, 1352 (D.C. Cir. 2002).  In addition, the Court

recognizes that "[i]t is a 'fundamental canon of statutory construction that the words of a statute

must be read in their context and with a view to their place in the overall statutory scheme.'"

FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (quoting Davis v. Michigan Dept. of Treasury, 489 U.S. 803, 809 (1989)).

The plaintiff's assertion that Congress was principally concerned with abuses in the "originate-to-distribute" model, and thus not with open market CLOs, Pl.'s Mot., Ex. A (Pet'r's Br.) at 37, is under-inclusive in light of the overall context and legislative history, which support the view that Congress intended to broadly delegate the task of regulation in this complex market to the expert agencies.  Cf. Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC, 525 F.2d 630, 636 (D.C. Cir. 1976).  The relevant Senate Report that accompanies the pertinent provision of the Dodd-Frank Act expresses Congress's intent to address the "[c]omplexity and opacity in securitization markets [that] created the conditions that allowed the financial shock from the subprime mortgage sector to spread into a global financial crisis."  S. Rep. No. 111-176, at 128 (2010).  The fact that Congress delegated to the agencies the responsibility to "recognize differences . . . [and] make appropriate adjustments" to advance the legislative goals, id. at 130, rather than delineate specifics in the legislation itself, supports the view that Congress was primarily focused on ensuring that certain actors in the securitization market had "skin in the game," id. at 129, but did not itself desire to tackle the precise complexities of the market Instead, Congress "expect[ed] that these regulations will recognize differences in the assets securitized, in existing risk management practices, . . . and that regulators will make appropriate adjustments to the amount of risk retention required," id. at 130.

### b.     The Definitions of "Securitizer" and "Sponsor"

The noted similarity between the second prong of the definition of "securitizer" and the SEC's pre-existing regulatory definition of a "sponsor" bolsters the Court's conclusion that Congress intended to broadly delegate rulemaking authority to the agencies.  The statute

provides that a securitizer can be "a <u>person who organizes and initiates an asset-backed securities</u> <u>transaction by selling or transferring assets, either directly or indirectly, including through an</u> <u>affiliate, to the issuer</u>." § 78o-11(a)(3)(B) (emphasis added).  Preexisting asset-backed securities regulations state that: "Sponsor means the <u>person who organizes and initiates an asset-backed</u> <u>securities transaction by selling or transferring assets, either directly or indirectly, including</u> <u>through an affiliate, to the issuing entity</u>." 17 C.F.R. § 229.1101 (emphasis added).  These two phrases are not merely substantially similar, but virtually identical.  The similitude here reinforces the Court's conclusion that Congress did not unambiguously intend to exclude open market CLO managers from the definition of "securitizer" because Congress not only approved of the agencies' previous decisions to construe the term "sponsor" broadly, but also chose to incorporate the agencies' broad definition of "sponsor" into the statutory definition of "securitizer."

### c.      The Term "Transfer"

Much of the parties' arguments regarding "securitizer" focus on how this Court should construe the term "transfer" in the statutory definition of "securitizer," which includes "a person who initiates an asset-backed securities transaction by selling or <u>transferring</u> assets, either directly or indirectly, including through an affiliate, to the issuer."  15 U.S.C. § 78o-11(a)(3)(B) (emphasis added).  The plaintiff essentially posits that the word "transfer" by definition requires that the actor have "initial ownership or possession" over the thing being transferred.  Pl.'s Mot., Ex. A (Pet'r' Br.) at 32.  The plaintiff therefore argues that "securitizer" cannot apply to an open market CLO manager because the manager only "acts as the agent of the CLO, selecting the loans on behalf of the CLO and investors[,] and implementing the CLO's purchase pursuant to a power of attorney," <u>id.</u> at 31, and "controls the asset after the CLO purchases it" without any

"initial ownership or possession," id. at 32.  The defendants respond that the plaintiff's

interpretation of "transfer" is "unnaturally narrow" and "would lead to an unstated and

unwarranted exemption for open market CLOs."  Defs.' Mot., Ex. A (Resp'ts' Br.) at 16.  Both

parties cite to various dictionary definitions to support their respective interpretations.  See Pl.'s

Mot., Ex. A (Pet'r' Br.) at 33–34; Defs.' Mot., Ex. A (Resp'ts' Br.) at 22.

      The Court finds the plaintiff's focus on the alleged possessory requirement of the term

"transfer" misplaced.  First, the plaintiff's assertion fails to take into account the relationship

between the phrase "selling or transferring assets" and the phrase "either directly or indirectly,"

which Congress placed in the statute immediately thereafter.  See 15 U.S.C. § 78o-11(a)(3)(B).

The Court believes that the concept of an "indirect transfer" divests the statutory term "transfer"

of any necessary or preexisting possessory or ownership element, even if such an element were

required under the plain meaning of the word "transfer."  Cf. Mediate possession, Black's Law

Dictionary (10th ed. 2014) (defining mediate or indirect possession as "[p]ossession of a thing

through someone else, such as an agent").[7]  Second, the Court agrees with the defendants that

Congress would be unlikely to "engage[ ] in a high-stakes game of hide-and-seek" with the

agencies if it wanted to specifically exempt managers of open market CLOs from an otherwise

broad statutory definition of "securitizer."  NACS v. Bd. of Governors of Fed. Reserve Sys., 746

F.3d 474, 494 (D.C. Cir. 2014) (citing Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468

(2001)), cert. denied, ___ U.S. ___, 135 S. Ct. 1170 (2015).  The Court rejects the notion that it

may read a particular exemption into a contextually broad statute based merely upon the

---

[7] The Court also recognizes that Congress expressly noted that "securitizers" are "defined as those who issue, organize, or initiate asset-backed securities."  See S. Rep. No. 111-176, at 128 (emphasis added).  Because Congress did not mention the word "transfer" or emphasize a direct possessory or ownership requirement when it explained this term, this provides further support that Congress did not intend to specifically exempt open market CLO managers from the definition of securitizer simply because these managers do not have "initial ownership or possession" over the asset being transferred.  See Pl.'s Mot., Ex. A (Pet'r' Br.) at 32.

contested definition of a single word.  See Whitman, 531 U.S. at 468 ("Congress . . . does not . . . hide elephants in mouseholes.").

The foregoing reasoning convinces the Court that Congress did not unambiguously foreclose the agencies from including open market CLO managers within the statutory definition of "securitizer."  See Vill. of Barrington, Ill. v. Surface Transp. Bd., 636 F.3d 650, 660 (D.C. Cir. 2011) (determining that where a "statutory ambiguity has left the agency with a range of possibilities and [ ] the agency's interpretation falls within that range," Chevron's first step has been met).  Accordingly, Chevron step one has been satisfied here because the statute is silent or ambiguous with respect to whether the term "securitizer" includes open market CLO managers. See Chevron, 467 U.S. at 843.

### 3.      Chevron Step Two

The defendants encourage the Court to defer to the agencies' interpretation of "securitizer" as including open market CLO managers.  Where, as in this case, it cannot be shown that Congress "unambiguously foreclosed the agency's construction of [a] statute," courts must "defer to the agency provided its construction is reasonable."  Cablevision Sys. Corp. v. FCC, 649 F.3d 695, 704 (D.C. Cir. 2011) (citing Nat'l Cable & Telecoms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980 (2005).  Agency constructions must also be "consistent with the statutory purpose and legislative history."  Bell Atl., 131 F.3d at 1049.  Interpretations that "diverge[ ] from any realistic meaning of the statute" will not be upheld.  Massachusetts v. Dep't of Transp., 93 F.3d 890, 893 (D.C. Cir. 1996).  However, "the whole point of Chevron is to leave the discretion provided by the ambiguities of a statute with the implementing agency."  Nat'l Cable & Telecoms. Ass'n, 545 U.S. at 981 (quoting Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 742 (1996)).  Deference is due to such agency determinations not only because

"Congress . . . delegated law-making authority to the agency, but also because that agency has the expertise to produce a reasoned decision."  Vill. of Barrington, 636 F.3d at 660 (citing Chevron, 467 U.S. at 844–45).  Failure to exercise "that expertise—for example, by simply picking a permissible interpretation out of a hat"—requires that no deference be given.  Id.  Using once more the "traditional tools of statutory construction," Chevron, 467 U.S. at 843 n.9, and considering only the rationales actually deployed by the agency before the onset of judicial review, Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212 (1988) (declining to "defer[] to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question"), a court must determine whether the agency's interpretation is "rationally related to the goals" of the statutory provision, AT & T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 388 (1999).

### a.   Rational Relationship to Legislative Goals

In the final rule, the agencies concluded that including open market CLOs under the risk retention requirements advanced Congress's legislative objectives because

> CLOs are a type of [collateralized debt obligation]. Both are organized and initiated by an asset manager that also actively manages the assets for a period of time after closing in compliance with investment guidelines. Typically, both CLOs and [collateralized debt obligations] are characterized by relatively simple sequential pay capital structures and significant participation by key investors in the negotiation of investment guidelines.

A.R. at JA2215 (79 Fed. Reg. at 77650).  The agencies observed that "CLO issuance has been increasing in recent years," and "[h]eightened activity in the leveraged loan market has been driven by search for yield and a corresponding increase in risk appetite by investors."  Id.  The agencies deduced from findings of increased activity in the leveraged loan market that have paralleled a rise in the "widespread loosening of underwriting standards," id., that "these developments . . . represent similar dynamics to issues in the originate-to-distribute model that

were a major factor in the recent financial crisis and that [15 U.S.C. § 78o-11] was intended to address," id. at JA2215–16 (79 Fed. Reg. at 77650–51).  The agencies also considered that "CLOs are organized and initiated by a CLO manager," who "will usually have sole discretion . . . to select portions of tranches of syndicated commercial loans on the primary or secondary market to be acquired by the CLO in compliance with the investment guidelines."  Id. at JA2215 (79 Fed. Reg. at 77650).  The agencies also acknowledged that although a special purpose vehicle does the actual work of packaging the loans into the CLO, "[t]he CLO manager retains the obligation to actively manage the asset portfolio, in accordance with the investment guidelines, and earns management fees and performance fees" in return for the services provided.  Id.

These considerations led to the agencies' reasonable conclusion that the open market CLO manager is an applicable "securitizer" under the statute "because [the manager] selects the commercial loans to be purchased by the CLO issuing entity for inclusion in the CLO collateral pool, and then manages the securitized assets once deposited in the CLO structure."  Id. at JA1237 (78 Fed. Reg. at 57962).  The agencies justified their interpretation under the second prong of the statutory definition—"a person who organizes and initiates an asset-backed securities transaction by selling or transferring assets, either directly or indirectly, including through an affiliate, to the issuer."  Id. (citing 15 U.S.C. § 78o-11(a)(3)).  According to the agencies' reasoning, this type of manager sufficiently "organizes and initiates" and "indirectly transfers" in accordance with the statutory text to be included under the credit risk retention rules because the manager controls the formation of the collateral pool, which the agencies considered "the essential aspect of the securitization transaction."  Id.  The agencies further justified their choice in remarking that both the statutory text and the legislative history of the Dodd-Frank Act

support their interpretation because open market CLO managers "are the parties who determine

the credit risk profile of securitized assets in many types of securitization transactions and

therefore should be subject to a regulatory incentive to monitor the quality of the assets they

cause to be transferred to an issuing entity." Id. Finally, the agencies expressed significant

concern that failure to apply the credit risk retention rule to the controlling managers and instead

applying it to an entity like the special purpose vehicle could create a loophole through which

"sponsors"—as securitizers under the statute—could "evade risk retention by hiring a third-party

manager to 'select' assets for purchase by the issuing entity that have been preapproved by the

sponsor." Id. at JA2220 (79 Fed. Reg. at 77655). This situation, according to the agencies,

could "result in a situation in which no party to a securitization can be found to be a 'securitizer'

because the party that organizes the transaction and has the most influence over the quality of the

securitized assets could avoid legally owning or possessing the assets." Id.

In affording the agencies deference under Chevron, the Court concludes that the

agencies' interpretations and justifications are not "plainly erroneous or inconsistent" with the

statutory definition at issue here, and thus merit "controlling weight." Banner Health v. Sebelius,

715 F. Supp. 2d 142, 154 (D.D.C. 2010) (Walton, J.) (quoting Thomas Jefferson Univ. v.

Shalala, 512 U.S. 504, 512 (1994); Presbyterian Med. Ctr. of Univ. of Pa. Health Sys. v. Shalala,

170 F.3d 1146, 1150 (D.C.Cir.1999)). The agencies engaged in deliberate and reasonable efforts

to identify both the securitization structures aptly targeted by the statute and the key players

within those structures to whom it would be most effective to permissibly target the credit risk

retention requirements in order to fulfill the statute's mandate. Although the plaintiff contends

that the note-issuing entity of the asset-backed security is an appropriate alternative to bear risk

because "that entity has a board and in particular equity holders sensitive to risk and able to

address it through the actions of managers," Pl.'s Reply, Ex. A (Pet'r's Reply) at 4–5, the Court

accepts the agencies' reasonable conclusions—as reflected in the administrative record—that

open market CLOs present an appropriate structure to apply the credit risk retention rules, and

the managers of these securitizations are reasonably defined as "securitizers" as a result of their

indirect efforts to transfer or sell assets by directing and structuring the composition of the CLO.

See Bell Atl., 131 F.3d at 1050 (affording deference to agency interpretations that were

"reasonable and consistent with the statute's history and purpose").  Having found the statutory

definition susceptible to ambiguity, the Court must agree with the defendants that the decision to

interpret the term "securitizers" to include open market CLO managers is reasonable and thus

entitled to deference.

### b.   Whether the Agencies' Definition of the Second Prong of Securitizer Renders the First Prong Mere Surplusage

The plaintiff argues that the agencies' interpretation of securitizer nevertheless "excised

the first prong of the [statutory] definition," Pl.'s Mot., Ex. A (Pet'r's Br.) at 28, i.e., "an issuer

of an asset-backed security," 15 U.S.C. § 78o-11(a)(3)(A), by effectively "declining to separately

define 'issuer,'" Pl.'s Mot., Ex. A (Pet'r's Br.) at 28, when the agencies adopted a broad

definition for the second prong, i.e., "a person who organizes and initiates an asset-backed

securities transaction by selling or transferring assets, either directly or indirectly, including

through an affiliate, to the issuer," 15 U.S.C. § 78o-11(a)(3)(B).  The plaintiff alleges agency

error in the decision to equate the pre-existing regulatory definition of "sponsor" with the second

prong of the definition of securitizer because the agencies subsequently "concluded that the

breadth of their new definition of 'sponsor' eliminated any need to construe or apply [the term]

'issuer.'"  Pl.'s Mot., Ex. A (Pet'r's Br.) at 28–29.  This action, the plaintiff contends, treats

significant statutory language as mere surplusage.  Id. at 29.  The defendants counter that "[w]ho

qualifies as an 'issuer' [under the first prong] has no bearing on whether [the open market] CLO manager[s]" at issue qualify as securitizers under the second prong.  Defs.' Mot., Ex. A (Resp'ts' Br.) at 28.   Further, the defendants argue that Congress's insertion of the disjunctive "or" between the two prongs permitted the agencies "to impose the requirement on any party that satisfies one of the two prongs."  Id.  The defendants also note that the agencies did, in fact, define "issuer" in accordance "with how that term . . . has been defined and used under the federal securities laws in connection with asset-backed securities."  Id. at 33.

The Court agrees with the defendants on this issue.  Certainly, courts should be "reluctan[t] to treat statutory terms as surplusage" in any setting.  Babbitt v. Sweet Home Chapter, Cmtys. for Great Ore., 515 U.S. 687, 698 (1995).  The plaintiff cites Bailey v. United States, 516 U.S. 137 (1995), superseded by statute as stated in Welch v. United States, ___ U.S. ___, ___, 136 S. Ct. 1257, 1267 (2016), to reinforce its argument that the breadth of the agencies' "sponsor" interpretation of the second prong impermissibly leaves "no role" for the first prong.  Pl.'s Reply, Ex. A (Pet'r's Reply) at 5 (citing Bailey, 516 U.S. at 145).  In Bailey, the Supreme Court considered how to interpret the word "use" in a criminal provision imposing specific penalties on those who "use[ ] or carr[y] a firearm" while committing a crime of violence or drug trafficking offense.  516 U.S. at 142–43.  The Supreme Court concluded "that 'use' must connote more than mere possession of a firearm by a person who commits a drug offense," but reasoned that if Congress had intended a broader conception of "possession" to trigger the statute's liability, "it easily could have so provided."  Id. at 143.  More recent Supreme Court decisions addressing statutory interpretations in the regulatory context instruct courts to "be guided to a degree by common sense as to the manner in which Congress" might delegate large regulatory decisions to an administrative agency.  Brown & Williamson Tobacco

Corp., 529 U.S. at 133.  Indeed, Congress is known to draft provisions that may "appear

duplicative of others" in order to "make assurance double sure," Shook v. D.C. Fin.

Responsibility & Mgmt. Assistance Auth., 132 F.3d 775, 782 (D.C. Cir. 1998) (internal

quotation marks omitted), and "[i]n some cases, redundancy may reflect the broad purpose of a

congressional statute," Nat'l Ass'n of Clean Water Agencies v. EPA, 734 F.3d 1115, 1126 (D.C.

Cir. 2013) (citing Sweet Home, 515 U.S. at 698 n.11).

     The agencies did not create impermissible surplusage by including open market CLO

managers in their definition of "securitizer."  In fact, as the defendants point out, the agencies did

define "issuer" by construing it to refer to the "depositor" of assets into a securitization vehicle

because that interpretation is "consistent with how that term has been defined and used under the

federal securities laws in connection with asset-backed securities."  Defs.' Mot., Ex. A (Resp'ts'

Br.) at 33 (citing A.R. at JA2174 (79 Fed. Reg. at 77609) (referencing 17 C.F.R. §§ 230.191,

240.3b-19)); cf. Chevron, 467 U.S. at 858 (lending significance to an agency determination to

construe a term in the statute "using the same definition" appearing in preexisting regulations).

The agencies' decision to impose the risk retention obligation requirements on open market CLO

managers under the second prong of the definition of "securitizer," rather than on the issuing

entities under the first prong of the definition, is a reasonable exercise of the authority Congress

delegated to the agencies under the statute, and does not render the first prong of the definition

surplusage.  See Nat'l Cable & Telecomms. Ass'n, 545 U.S. at 980 ("[A]mbiguities in statutes

within an agency's jurisdiction to administer are delegations of authority to the agency to fill the

statutory gap in reasonable fashion.  Filling these gaps . . . involves difficult policy choices that

agencies are better equipped to make than courts." (citing Chevron, 467 U.S. at 865–66)).

Further, Congress made two distinct choices in its phrasing of the definition of "securitizer" that support the defendants' position that the agencies were permitted "to impose the requirement on any party that satisfies one of the two prongs." Defs.' Mot., Ex. A (Resp'ts' Br.) at 28. First, Congress used the term "or" to separate the two prongs, which should typically "be accepted for its disjunctive connotation" absent any resulting frustration of legislative intent. Unification Church v. Immigration & Naturalization Serv., 762 F.2d 1077, 1084 (D.C. Cir. 1985) (citations omitted) (finding a conjunctive connotation for "or" where the "usual disjunctive connotation [was] demonstrably at odds with the will of Congress"). This choice suggests a statutory delegation allowing the agencies to consider whether only one of the statutory prongs required consideration before they made a decision. See Nw. Airlines, Inc. v. FAA, 14 F.3d 64, 69 (D.C. Cir. 1994) ("[T]he most natural reading of the statute is the one proposed by the FAA[—]that is, by joining the criteria for PFC approval with an "or," Congress wanted only to ensure that all PFC-approved projects furthered one of the three statutory goals."). Other "valid alternative readings" may exist, as the plaintiff posits, see Pl.'s Mot., Ex. A (Pet'r's Br.) at 27–28, but the Court "need only ask whether the [agencies'] interpretation is reasonable," id. Second, as previously discussed above, a significant portion of the wording Congress chose is virtually identical to the agencies' preexisting regulatory definition of "sponsor." See supra at 16–17. This phrasing, which cannot represent a mere coincidence, sufficiently demonstrates that the agencies reasonably inferred that the statutory definition went beyond the narrow reading advanced by the plaintiff. Considering Congress's chosen terms in the statute, the Court cannot say that Congress drafted § 78o-11(a)(3) in a manner that foreclosed the agencies from concluding that their prior "sponsor" definition would suffice in interpreting the term "securitizer." The Court therefore rejects the plaintiff's impermissible surplusage argument.

c.      **Open Market CLO Managers as "Owners"**

Finally, the plaintiff argues that retaining risk "makes no sense and cannot have been intended" for a manager of an open market CLO because the manager "does not own or possess any assets [and] has no associated credit risk to 'retain' or to part with through a 'sale or transfer.'"   Pl.'s Mot., Ex. A (Pet'r's Br.) at 32.  The Court has already expressed its skepticism regarding this ownership-focused line of reasoning as applied to the statute.  See supra at 17–19. This skepticism only increases when the Court considers that open market CLO managers may already receive compensation "in part based on the performance of managed assets," Pl.'s Mot., Ex. A (Pet'r's Br.) at 13, which "reflects the most concentrated credit risk," id. at 14.

In other words, the fact that some CLO managers may receive compensation based in part on the CLO's performance shows that private entities recognize the organizational power of the manager in building a stable CLO.  Indeed, the agencies noted in the final rule that because special purpose vehicles and investors in the open market CLO structures do not choose or monitor assets in the CLO itself, it makes less sense for them to retain risk instead of the managers that do select and monitor the assets.  See A.R. at JA2219 (79 Fed. Reg. at 77654) ("[T]he CLO manager has sole authority to select the commercial loans to be purchased by the CLO issuing entity for inclusion in the CLO collateral pool, directs the issuing entity to purchase such assets in accordance with investment guidelines, and manages the securitized assets once deposited in the CLO structure.").  The plaintiff contends that other entities are more appropriate to bear the risk because they might have "a board and in particular equity holders sensitive to risk and able to address it through the actions of managers."  Pl.'s Reply, Ex. A (Pet'r's Reply) at 4–5.  The agencies reasonably determined that these entities were not as aptly positioned to bear the risk, however, because the managers exercise a greater degree of control over regular

transactions and regulating other potential entities would do less to effectuate Congress's intent

in prescribing the credit risk retention mandate.  See A.R. at JA2220 (79 Fed. Reg. at 77655)

("Like other securitization sponsors, a CLO manager is the party best positioned to adequately

monitor and assess the risk of the securitized assets.").  Therefore, the Court defers to the

defendants in accordance with Chevron, and concludes that their interpretation of "securitizer" to

include open market CLO managers is reasonable.

**B.      "Fair Value" in Determining Credit Risk Retention**

The plaintiff's second major assertion is that the agencies failed to appropriately base the

risk retention rules on "credit risk," as required by the statute.  Pl.'s Mot., Ex. A (Pet'r's Br.) at

38.  The statute provides that the "prescribed regulations [must] require any securitizer to retain

an economic interest in a portion of the credit risk for any . . . asset."  15 U.S.C. § 78o-11(b)(1)

(emphasis added).  In this second assignment of error, the plaintiff argues that because the

agencies' risk retention rules "requir[e] that securitizers retain . . . [an] economic or market

value" of the asset, the agencies acted arbitrarily and capriciously in "construing and

implementing the core provision" of "credit risk."  Pl.'s Mot., Ex. A (Pet'r's Br.) at 38.  The

Court finds the plaintiff's argument unpersuasive.

**1.      Reliance on a Factor Precluded from Consideration**

The plaintiff urges the Court to examine whether the agencies' use of "fair value" as a

measure to assess "credit risk" represents a factor the agencies were precluded from considering

by Congress.  Pl.'s Mot., Ex. A (Pet'r's Br.) at 48.  The agencies adopted fair value as a means to

measure asset-backed security interests retained in accordance with the horizontal risk retention

option or partial horizontal holdings in a combination retention option.  See A.R. at JA2281 (79

Fed. Reg. at 77716).[8]  The defendants argue that their use of fair value is a reasonable way to measure credit risk because the statute does not provide a "method for assessing credit risk," and Congress "did not dictate how the agencies were to implement" the regulation.  Defs.' Mot., Ex. A (Resp'ts' Br.) at 17.  Certainly, "if Congress 'has directly spoken to the precise question at issue,' the court and the agency 'must give effect to the unambiguously expressed intent.'"  Agape Church, Inc. v. FCC, 738 F.3d 397, 406 (D.C. Cir. 2013) (citing Chevron, 467 U.S. at 842–43).  Further, "reasoned decisionmaking" requires that "the agenc[ies] did not rely on factors which Congress did not intend for [them] to consider."  Pharm. Research & Mfrs. of Am. v. FTC, 790 F.3d 198, 212 (D.C. Cir. 2015).

The Court concludes that the agencies' use of "fair value" to determine the required level of retained interest in the asset-backed securities does not constitute the impermissible consideration of a factor precluded by Congress.  The statute requires the agencies to promulgate rules designed to ensure that securitizers "retain an economic interest in a portion of the credit risk" in the applicable assets.  15 U.S.C. § 78o-11(b)(1).  The statute further directs the agencies to require an effective retention of "not less than [five] percent of the credit risk for any [qualified] asset."  Id. § 78o-11(c)(1)(B).  Congress did not define "credit risk," nor did it provide an express methodology for the agencies to employ to require securitizers to retain their "economic interest in a portion of the credit risk."  Id. § 78o-11(b)(1); see generally id. § 78o-11.

The plaintiff contends that "fair value" is an entirely "different concept than 'credit risk,'" and that using what amounts to "economic or market value as the basis for [the agencies']

---

[8] Asset-backed security interests retained in accordance with the vertical risk retention option or partial vertical interests under the combined retention option do not require the same fair value framework because the agencies "were persuaded by commenters that such measurement is not necessary to ensure that the sponsor has retained [five] percent of the credit risk."  A.R. at JA2281 (79 Fed. Reg. at 77716).

rules produces results wildly at odds with the statutory direction." Pl.'s Mot., Ex. A (Pet'r's Br.) at 40. The legislative history, however, indicates that Congress intended for securitizers to retain a "material amount of risk" sufficient to ensure that securitizers "align[] their economic interest with those of investors." S. Rep. No. 111-176, at 129. In light of the statute's imprecision and Congress's broad objective, the Court agrees with the defendants that "Congress did not provide any direction as to how the agencies were to ensure securitizers retain [five] percent exposure to the credit risk." Defs.' Mot., Ex. A (Resp'ts' Br.) at 44. Although it is true that "an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider," State Farm, 463 U.S. at 43, courts must be reluctant "to infer from congressional silence an intention to preclude the agency from considering factors other than those listed in a statute," Nat'l Ass'n of Clean Air Agencies v. EPA, 489 F.3d 1221, 1230 (D.C. Cir. 2007) (citing George E. Warren Corp v. EPA, 159 F.3d 616, 623 (D.C. Cir. 1998)). Because this statute contains no "clear congressional direction to the contrary, [the Court] will not deprive the agenc[ies] of the power to fine-tune [their] regulations." Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. United States, 735 F.2d 1525, 1529 (D.C. Cir. 1984). Thus, the Court concludes that the agencies' use of fair value was not precluded by Congress.

### 2.    Reasoned Explanation for the Use of Fair Value

The plaintiff claims that the agencies "never articulate[d] why fair value served as a valid proxy for credit risk," Pl.'s Mot., Ex. A (Pet'r's Br.) at 48, and failed to address concerns over the potential difference in required economic retention between the agencies' adopted fair value measurements and the plaintiff's conception of "credit risk," id. at 49–50. In considering these positions, the Court "retain[s] a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." Judulang v. Holder, ___ U.S. ___, ___, 132 S. Ct. 476,

483–84 (2011).  "[R]easoned decisionmaking" requires that agencies promulgate rules "in observance of procedures required by law." Pharm. Research, 790 F.3d at 212.  Agencies must provide reasoned explanations for their actions, see Fox Television Stations, Inc., 556 U.S. at 515, and must base their decisions on a consideration of the relevant factors, see State Farm, 463 U.S. at 43.  The Court cannot supply a reasoned basis for the agency's action that the agency itself has not provided, but may "uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned." Id. (internal quotation marks and citations omitted).

The agencies' final rules adopted "a minimum [five] percent base risk retention requirement to all securitization transactions" within the scope of the statute.  A.R. at JA2172 (79 Fed. Reg. at 77607).  As the agencies described it:

> The final rule also allows a sponsor to satisfy its risk retention obligation by retaining an eligible vertical interest, an eligible horizontal residual interest, or any combination thereof as long as the amount of the eligible vertical interest and the amount of the eligible horizontal residual interest combined is no less than [five] percent. The amount of the eligible vertical interest is equal to the percentage of each class of [asset-backed security] interests issued in the securitization transaction held by the sponsor as eligible vertical risk retention. The amount of eligible horizontal residual interest is equal to the fair value of the eligible horizontal residual interest divided by the fair value of all [asset-backed security] interests issued in the securitization transaction.

Id. at JA2172 (79 Fed. Reg. 77607).  The plaintiff notes, and the defendants agree, that "a purely 'vertical' holding . . . amounts to retention of [five] percent of credit risk [ ] because holding a pro rata [proportional] share of all the securities . . . ensures a pro rata [proportional] holding of the total credit risk of the underlying assets." Pl.'s Mot., Ex. A (Pet'r's Br.) at 40; see also Defs.' Mot., Ex. A (Resp'ts' Br.) at 39–40.  Therefore, it is undisputed that the pure vertical option for risk retention reasonably satisfies the statute's minimum requirement—an effective retention of five percent of the securitization's credit risk—regardless of any overarching consideration of the entire securitization's "fair value." See 15 U.S.C. § 78o-11(c)(1)(B).

The question for the Court is whether, in deciding to use fair value to measure horizontal risk retention, the agencies failed to "articulate a satisfactory explanation for [their] action" or establish "a rational connection between the facts found and choices made." State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines, 371 U.S. at 168). The agencies have not failed in this regard. In the midst of the rulemaking, the SEC explained its reasoning for the use of fair value in the modified proposed rules:

> The [SEC] believes that [requiring sponsors to measure horizontal risk retention using a fair value framework] would align the measurement more closely with the economics of a securitization transaction because market valuations more precisely reflect the securitizer's underlying economic exposure to borrower default. Defining a fair value framework also may enhance comparability across different securitizations and provide greater clarity and transparency.

A.R. at JA1285 (78 Fed. Reg. at 58010). Further, the agencies reasoned that a fair value framework "uses methods more consistent with market practices." Id. at JA1213 (78 Fed. Reg. at 57938). The administrative record shows that, contrary to the plaintiff's assertions, the agencies did articulate their reasoning for using fair value to measure horizontal risk retention in the final rule:

> [T]o provide greater clarity for the measurement of risk retention and to help prevent sponsors from structuring around their risk retention requirement by negating or reducing the economic exposure they are required to maintain, the agencies proposed to require sponsors to measure their risk retention requirement using fair valuation methodologies acceptable under [generally accepted accounting principles]. . . . [T]he agencies are adopting a fair value framework substantially similar to the reproposal for calculating eligible horizontal residual interests in the final rule . . . . [T]his measurement uses methods consistent with valuation methodologies familiar to market participants and provides a consistent framework for calculating residual risk retention across different securitization transactions. It also takes into account various economic factors that may affect the securitization transaction, which should aid investors in assessing the degree to which a sponsor is exposed to the risk of the securitized assets.

A.R. at JA2181 (79 Fed. Reg. at 77616).

The Court concludes from the foregoing explanation that the agencies acted appropriately because "the choices made by the [agency] were reasonable and supported by the record." Am. Trucking Ass'ns v. EPA, 283 F.3d 355, 362 (D.C. Cir. 2002) (quoting Lead Indus. Ass'n v. EPA, 647 F.2d 1130, 1160 (D.C. Cir. 1980)).  The agencies reasonably concluded during the rulemaking that using fair value as a means to measure horizontal risk retention provided the agencies with a valid means to ensure consistency across different types of secured transactions, provided regulated parties with a familiar methodology to assist investors with assessing risk, and adequately ensured exposure to credit risk in accordance with the statute.  See A.R. at JA2181 (79 Fed. Reg. at 77616).  These reasons are tied to the purposes of the statute and the "appropriate operation of" the relevant financial system, see Judulang, ___ U.S. at ___, 132 S. Ct. at 485, and the Court can "reasonably . . . discern[]" the path of the agencies' decisionmaking, State Farm, 463 U.S. at 43 (quoting Bowman, 419 U.S. at 286).  The administrative record does not reflect, nor can the plaintiff show, that the agencies failed to explain why fair value considerations were implemented, see Black Oak Energy, LLC v. FERC, 725 F.3d 230, 243–44 (D.C. Cir. 2013) (holding that the Federal Energy Regulatory Commission's orders requiring the regional transmission organization to recoup funds were arbitrary and capricious because the Commission failed to explain why recouping funds was warranted), or that the agencies' considerations for how to measure credit risk were inconsistent, see Bus. Roundtable v. SEC, 647 F.3d 1144, 1153–54 (D.C. Cir. 2011) (holding that the SEC's "discussion of the estimated frequency of [shareholder director] nominations under [its rule wa]s internally inconsistent and therefore arbitrary").  Given that deference to agency decisionmaking is substantial where predictive judgments and expert assessments come into play, the Court "cannot 'substitute [its] judgment for the agenc[ies'], especially when, as here, the decision

under review requires expert policy judgment of a technical, complex, and dynamic subject.'"
Agape Church, Inc., 738 F.3d at 408 (quoting Cablevision Sys. Corp. v. FCC, 597 F.3d 1306,
1311 (D.C. Cir. 2010)).

### 3.     The Difference Between Pure Vertical and Pure Horizontal Options

The plaintiff devotes much of its brief to emphasizing the perceived economic difference

in risk retention between the minimal credit risk held by securitizers electing to use a pure

vertical option and the higher effective credit and economic risk held by those who choose the

pure horizontal option as evidence that the agencies' use of fair value was arbitrary and

capricious.  Pl.'s Mot., Ex. A (Pet'r's Br.) at 40–47.  The agencies, however, adequately

addressed this difference in the administrative record.  The agencies acknowledged throughout

the rulemaking that the horizontal option was "most exposed to credit risk," A.R. at JA1287 (78

Fed. Reg. at 58012), and would "impose the most economic risk on a sponsor," id. at JA1215 (78

Fed. Reg. at 57940).  But the agencies highlighted several reasons during the rulemaking why a

horizontal holding of some kind might be desirable, despite the increased risk retention.  See,

e.g., id. at JA1288 (78 Fed. Reg. at 58013) (noting in the modified proposed rule that choosing a

horizontal option may "signal to the market that the sponsor's incentives are better aligned with

investors' [incentives]"); id. at JA2284 (79 Fed. Reg. at 77719) (reiterating in the final rule that

the horizontal option "signals to investors that the information about the asset portfolio being

securitized is accurately represented and fairly priced," which might "improve investor

participation and lead to enhanced capital formation").

Moreover, the agencies specifically "provide[d] for a combined standard risk retention

option that would permit a sponsor to satisfy its risk retention obligation by retaining an 'eligible

vertical interest,' an 'eligible horizontal residual interest,' or any combination thereof," while

leaving the pure vertical holding as the baseline five percent credit risk retention requirement, id. at JA1212 (78 Fed. Reg. at 57937), so long as the risk retention comports with the statutorily required retention of "not less than [five] percent of the credit risk," 15 U.S.C. § 78o-11(c)(1)(B)(i).  Because the statute expressly allows for credit risk retention of more than five percent, the mere fact that alternate options available to securitizers might require higher effective credit risk retention does not defeat the agencies' reasoning.  Even if attempting to gain the benefits of both the low-retention vertical option and the high-clarity horizontal option through a hybridized retention plan "present[s] a conceptual difficulty," as the plaintiff asserts, Pl.'s Mot., Ex. A (Pet'r's Br.) at 42, nothing in the rules prevents regulated parties from selecting the simpler purely vertical or purely horizontal options.  It may be the case that some securitizers will find using a partial or pure horizontal holding "an unattractive solution to all their 'problems[,]' [b]ut that does not mean that the availability of this option does not increase [their] flexibility."  Melcher v. FCC, 134 F.3d 1143, 1159 (D.C. Cir. 1998).  Consequently, the plaintiff's invocation of the difference between the pure risk retention options to show that the agencies acted in an arbitrary and capricious manner is without merit.

### 4.     The Agencies' Alleged Failure to Address Comments

The plaintiff further alleges that the agencies failed to address the concerns of a subset of commenters who sought "to have the agencies have the requirement focus on retention of credit risk, not economic value."  Pl.'s Mot., Ex. A (Pet'r's Br.) at 49–50.  Indeed, failure to address issues raised in comments may require a finding that the agencies acted in violation of the APA by "fail[ing] 'to consider an important aspect of the problem.'"  See Fox Television Stations, Inc. v. FCC, 280 F.3d 1027, 1051 (D.C. Cir. 2002) (quoting State Farm, 463 U.S. at 43).  In responding to comments, "an agency must consider only 'significant and viable' and 'obvious'

alternatives." <u>Nat'l Shooting Sports Found., Inc. v. Jones</u>, 716 F.3d 200, 215 (D.C. Cir. 2013)

(quoting <u>City of Brookings Mun. Tel. Co. v. FCC</u>, 822 F.2d 1153, 1169 (D.C. Cir. 1987)).

Agencies "need not address every comment, but [they] must respond in a reasoned manner to

those that raise significant problems." <u>Covad Commc'ns Co. v. FCC</u>, 450 F.3d 528, 550 (D.C.

Cir. 2006) (internal quotation marks and citations omitted).

The plaintiff cites various comments attacking the agencies' usage of fair value on the

bases that the agencies failed to properly interpret the statute, that the implementation in

horizontal holdings "made no sense" due to the nature of possible losses, that the difference

between the pure vertical and horizontal options was too dramatic, and that "the horizontal

interest should be reduced to have the sponsor retain credit risk close to [five] percent."  Pl.'s

Mot., Ex. A (Pet'r's Br.) at 43 (citing A.R. at JA0787 (American Bar Association), JA1016

(American Bankers' Association), JA1713 (Structured Finance Industry Group), JA1438–39

(Bank of America), JA1141–50 (Loan Syndications and Trading Association)).  The plaintiff

alleges that the agencies continually "sidestepped the central issue" of using fair value as a proxy

for credit risk and failed to squarely address the concerns of these comments.  <u>Id.</u> at 45.  The

Court disagrees.

The agencies essentially addressed these comments by noting in the final rule that

commenters questioned the use of fair value in several contexts.  <u>See</u> A.R. at JA2171–72 (79

Fed. Reg. at 77606) (after noting that "a significant number of commenters commented on the

agencies' use of fair value to measure risk retention," the agencies reiterated that the final rule

would use fair value as a gauge for retained interest in the horizontal risk retention option); <u>id.</u> at

JA2181 (79 Fed. Reg. at 77616) (after summarizing various comments concerning "specific

accounting concerns regarding the use of fair value to measure risk retention," the agencies

stated that they were adopting a fair value framework "us[ing] methods consistent with valuation methodologies familiar to market participants and provid[ing] a consistent framework for calculating residual risk retention across different securitization transactions").   Even though the agencies did not necessarily address each and every concern raised by these comments, "[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors." Covad, 450 F.3d at 550 (quoting Thompson v. Clark, 741 F.2d 401, 409 (D.C. Cir. 1984)).   As already recognized by the Court, the agencies repeatedly justified their reasonable use of fair value.  See supra at 30–33. The agencies explained their decision to use fair value at multiple points in the rulemaking process, including after noting in the final rule that "[c]ommenters expressed several specific accounting concerns regarding the use of fair value to measure risk retention." A.R. at JA2181 (79 Fed. Reg. at 77616).   "This response demonstrates that the agenc[ies] considered and rejected [the plaintiff's] arguments . . . .  This is all the APA requires." City of Waukesha v. EPA, 320 F.3d 228, 258 (D.C. Cir. 2003).  In other words, the comments presented nothing that "required some explanation beyond that already contained within the rulemaking record to assure [the Court] that 'all relevant factors ha[d] been considered.'" Thompson, 741 F.2d at 409–10 (quoting Home Box Office, Inc. v. FCC, 567 F.2d 9, 36 (D.C. Cir. 1977)).

### 5.    The Difference Between the Vertical Option and the Combination Options

The plaintiff points to National Mining Ass'n v. Army Corps of Engineers, 145 F.3d 1399, 1407 (D.C. Cir. 1998), as support for its argument that "[t]he agencies' baseline rule permits any of an infinite number of combinations of horizontal and vertical interests" and "[t]o say that only the purely vertical [option] accords with the statutory standard is hardly rational decisionmaking," Pl.'s Reply, Ex. A (Pet'r's Reply) at 19.  The plaintiff asserts that the District

of Columbia Circuit decided against the Army Corps of Engineers in National Mining "in light

of 'systemic disparity between the statutory standard and [the agency's] approach" in

promulgating a regulation.  Id. (quoting Nat'l Mining, 145 F.3d at 1407).  This characterization

and the derivative argument are misplaced and fail to support the plaintiff's assertion.  The

portion of National Mining quoted by the plaintiff serves merely to support that case's discussion

of the Supreme Court's upholding of "a facial challenge under normal Chevron standards despite

the existence of clearly valid applications of [a] regulation" that Congress intended to include a

wider breadth of coverage than the agency rules provided for.  Nat'l Mining, 145 F.3d at 1407.

This is not the situation presented by the parties in this case.  The dispute here instead concerns

regulatory options under a vague statutory standard that may go above the prescribed minimum,

but are not required, to satisfy the regulation.

The plaintiff glosses over the fact that the final rules implemented (1) a pure vertical risk

retention option that allows securitizers to retain the statute's absolute minimum amount of

required risk, (2) the ability to combine horizontal and vertical holdings, and (3) an additional

"lead arranger" retention option specifically for CLOs, all indications that the agencies

considered and attempted to address the broader qualms raised by commenters advocating for

CLOs earlier in the rulemaking.  A.R. at JA2178, 2216 (79 Fed. Reg. at 77613, 77651).  In other

words, the pure vertical option undisputably satisfies the bare minimum of the Congressional

mandate and the agencies' expectations.  See id. at JA2271 (79 Fed. Reg. at 77706) ("A sponsor

relying exclusively on the vertical risk retention option will hold [five] percent of every tranche,

from the senior tranche to the residual interest, and shares the same credit risk as investors in

every tranche.").  In addition to the vertical option, the agencies provided other options—the

horizontal and combination options— that may be utilized by regulated entities if they desire the

added benefits of enhanced investor clarity.  See id. at JA2281 (79 Fed. Reg. at 77716) ("The agencies are adopting a requirement for sponsors to measure risk retention of an 'eligible horizontal residual interest' . . . using a fair value measurement framework consistent with [generally acceptable accounting principles].").

The plaintiff also contends that "[t]he agencies are not permitted, in the vast range of applications of their rule, to set standards of uncertain amounts of risk."  Pl.'s Reply, Ex. A (Pet'r's Reply) at 19 (citing Time Warner Entm't Co. v. FCC, 240 F.3d 1126, 1137–38 (D.C. Cir. 2001)).  But the Time Warner case cited by the plaintiff in support of this argument involved the FCC's imposition of a "numerical line" regulation that needed to meet both the tests for arbitrariness under the APA and "First Amendment intermediate scrutiny."  240 F.3d at 1137. The District of Columbia Circuit in that case noted that the agency seemed to conjure the numerical regulation "out of thin air" and provided no explanation for its decision other than "we believe that [the limit] is appropriate to balance the goals."  Id.  This case involves no such concerns and the plaintiff's cited authority does not support its proposition.  As the Court has already discussed, the agencies' final rule allows a vertical retention option that meets the exact minimum dictation of the governing statute, as well as non-mandatory horizontal options for deviation that permit regulated entities to make their securitizations more attractive at the cost of greater risk retention.[9]  The agencies did not conjure fair value "out of thin air," id., but rather explained their decision by stating that fair value

---

[9] The plaintiff also takes particular issue with the defendants' argument that the agencies based their construction of credit risk on a "total-loss scenario" because "that rationale is entirely a post hoc justification, and that construction would be unreasonable even had the agencies' orders articulated it."  Pl.'s Reply, Ex. A (Pet'r's Reply) at 10–11. Although the administrative record indicates that a "first-loss" scenario justification may have been contemplated by the agencies in their initial proposed rule, see A.R. at JA0188 (76 Fed. Reg. at 24102) (noting that "[t]he proposed rules include a number of terms and conditions governing the structure of an eligible horizontal residual interest in order to ensure that the interest would be a 'first-loss' position"), the Court is inclined to agree that a "total-loss" scenario rationale relies on post hoc arguments.  But the Court need not decide this issue because it has already held that fair value was otherwise appropriately considered by the agencies.

uses methods consistent with valuation methodologies familiar to market participants and provides a consistent framework for calculating residual risk retention across different securitization transactions.  It also takes into account various economic factors that may affect the securitization transaction, which should aid investors in assessing the degree to which a sponsor is exposed to the risk of the securitized assets.

A.R. at JA2181 (79 Fed. Reg. at 77616).  In sum, the agencies appropriately interpreted and

discharged the statute's credit risk retention requirement in their rulemaking, and they adequately

considered all relevant aspects of the problems presented.

## C.      Declining Exemption or Adjustment for Managers of Open Market CLOs

The third and final major issue raised by the plaintiff concerns the agencies' power to

grant exemptions or adjustments to the mandated credit risk retention rules.  The plaintiff argues

that the agencies "erred in declining to exempt [managers of open market CLOs] from the

retention requirements or adjust those requirements to enable managers to adhere to industry

'best practices' to retain the benchmark level of credit risk without having to commit excessive

capital."  Pl.'s Mot., Ex. A (Pet'r's Br.) at 50.  The plaintiff alleges that the agencies could not

adequately explain their reasons for declining requests from commenters to exempt open market

CLO managers or otherwise adjust the requirements based on the statutory exemption standards

and relied on reasons that "were internally inconsistent, illogical, or unsupported by the record."

Id.  The plaintiff points to commenters who "argued that the structure, operation, and

performance of open market CLOs justified either an exemption from or an adjustment to the

credit risk requirements."  Id.  The plaintiff argues that the factors raised by comments—which

included the managers' lack of actual ownership or origination of the underlying loans, the

existence of some "investor-developed agreements" made to control investment parameters,

"initial and ongoing transparency, "active investment management," and certain manager

compensation structures based in part on CLO performance—supported the commenters'

proposals to "alter [the] 'horizontal' risk retention requirements to ensure that managers of open market CLOs were relieved of excessive capital commitments while still retaining far more than [five] percent of credit risk."  Id. at 50–51.  Rejection of the proposals emanating from these comments, according to the plaintiff, was unlawful due to the agencies' failure to properly address the statutory factors for exemption consideration, the agencies' failure to appropriately assess the costs and benefits associated with declining to grant adjustments, and the agencies' failure to, once again, properly assess appropriate levels of credit risk retention.  Id. at 53–62. The defendants respond that the agencies "reasonably implemented the statutory scheme and fully complied with the APA," Defs.' Mot., Ex. A (Resp'ts' Br.) at 53, in declining to "grant discretionary exemptions for CLOs from risk retention requirements or adjust those requirements to [the plaintiff's] satisfaction," id. at 52.

The statute provides that "[t]he Federal banking agencies and the [SEC] may jointly adopt or issue exemptions, exceptions, or adjustments to the rules issued under this section."  15 U.S.C. § 78o-11(e)(1).  Any such exemptions or adjustments shall:

> (A) help ensure high quality underwriting standards for the securitizers and originators of assets that are securitized or available for securitization; and

> (B) encourage appropriate risk management practices by the securitizers and originators of assets, improve the access of consumers and businesses to credit on reasonable terms, or otherwise be in the public interest and for the protection of investors.

Id. § 78o-11(e)(2).

In considering the agencies' refusal to grant an exemption for open-market CLO managers, the scope of the Court's review is "quite narrow."  Marshall Cty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1225 (D.C. Cir. 1993).  Nevertheless, such agency decisions only remain untouchable if they "examine the relevant data and articulate a satisfactory explanation for its

action including a 'rational connection between the facts found and the choice made.'" State

Farm, 463 U.S. at 43 (quoting Burlington Truck Lines, 371 U.S. at 168).  The "ample power"

provided by Congress here for the agencies to regulate complex industries "carries with it the

correlative responsibility of the agenc[ies] to explain the rationale and factual basis for [their]

decision."  Bowen, 476 U.S. at 627.  However, courts must "show respect for the agenc[ies']

judgment in both."  Id.  Moreover, where rulemaking under a "broad statutory directive" might

implicate "predictive judgments about a variety of relevant factors," agency action in such

circumstances necessitates some degree of increased deference.  Bradford Nat. Clearing Corp. v.

SEC, 590 F.2d 1085, 1103 (D.C. Cir. 1978) (citations omitted); see also Nat'l Tel. Co-op. Ass'n

v. FCC, 563 F.3d 536, 541 (D.C. Cir. 2009) (acknowledging the narrowness of review when a

case involves agency "predictive judgments about the likely economic effects of a rule").

### 1.      The Statutory Factors of Exemption Consideration

The Court is not persuaded that the agencies unlawfully skirted a purported obligation to

grant adjustments to open market CLO managers under the credit risk retention rules.

Subsection (e) of the statute permits the agencies to grant exemptions or adjustments if such

modifications "help ensure high quality underwriting standards" and "encourage appropriate risk

management practices by the securitizers and originators of assets, improve the access of

consumers and businesses to credit on reasonable terms, or otherwise [are] in the public interest

and for the protection of investors."  15 U.S.C. § 78o-11(e)(2)(A), (B).  The statute does not

provide a method by which the agencies may make these determinations or include definitional

statements for unclear terms like "high quality underwriting."  See generally id. § 78o-11.  In

considering whether to grant the various CLO exemptions requested based on the purported

supporting structural features, the agencies responded in the final rule as follows:

> While the agencies recognize that certain structural features of CLOs contribute to aligning the interests of CLO managers with investors, the agencies do not believe these structural features would support a finding that the exemption would help ensure high quality underwriting standards and there are reasons why such an exemption may run counter to the public interest and protection of investors.

A.R. at JA2221 (79 Fed. Reg. at 77656).

The plaintiff insists that the agencies have "[n]o articulated basis" to support this "bare conclusion," Pl.'s Mot., Ex. A (Pet'r's Br.) at 53, but the administrative record reflects otherwise. The agencies stated in the final rule that "CLO[s] are a type of [collateralized debt obligation]," A.R. at JA2215 (79 Fed. Reg. at 77650), and discussed "many of the structural features" of CLOs put forward by the plaintiff and other commenters that "were shared by other types of [collateralized debt obligations] . . . that performed poorly during the financial crisis," id. at JA2221 (79 Fed. Reg. at 77656).  For example, the agencies noted that preexisting CLO management fees that may already incorporate some degree of credit risk sensitivity represent a "subordinated compensation structure" that may align the goals of investors with CLO managers in some situations, but "could also lead to a misalignment of interests" in others," and "these fees do not appear to provide an adequate substitute for risk retention because they typically have small expected value."  Id.  Further, the plaintiff's contention that the agencies failed to address the fact that CLOs performed better than the collateralized debt obligations that performed poorly during the financial crisis, Pl.'s Mot., Ex. A (Pet'r's Br.) at 59, overlooks the agency determinations that "CLOs and [collateralized debt obligations] have the same general structure," A.R. at JA2218 n.161 (79 Fed. Reg. at 77653 n.161), that "many of the structural features that commenters cited as mitigating risk factors for CLOs were shared by . . . [collateralized debt obligations] of asset-backed securities," A.R. at JA2221 (79 Fed. Reg. 77656), and "the better performance of leveraged loans after the financial crisis in CLO portfolios could be partially

attributed to lowered interest rates and other government interventions.," id.; see also id. at JA2293 (79 Fed. Reg. at 77728) (noting the SEC's conclusion that commenters' invocation of CLO performance during the financial crisis "has the benefit of hindsight" because "during the financial crisis, there were considerable concerns with the ability of borrowers to meet their financial obligations through their collateralized loans" and "aggressive monetary policy resulted in . . . making it easier for borrowers to meet their loan obligations").  On the whole, the agencies reasonably addressed and considered the relevant factors behind the various proposals for exemptions, id. at JA2221–23 (79 Fed. Reg. at 77656–58),[10] and remained steadfast that the rules' broader concern of avoiding "an environment susceptible to some of the abuses and excesses" that contributed to the financial crisis justified avoiding the requested adjustments, id. at JA2223 (79 Fed. Reg. at 77658); see also id. at JA2293 (79 Fed. Reg. at 77728) (SEC's separate consideration of proposed adjustments and its conclusion that "commenters' alternate suggestions do not create sufficient incentive alignment").[11]  The Court finds the agencies' rejection of requests for exemptions or adjustments on the basis of CLO structural factors was made in accordance with the statutory directives and was "both reasonable and reasonably explained."  See Nat'l Tel. Co-op, 563 F.3d at 542.[12]

---

[10] The plaintiff states that these portions of the record address only requests for "total exemption[s]" rather than "adjustments."  Pl.'s Reply, Ex. A (Pet'r's Reply) at 24.  However, the agencies' discussion in its totality and the agencies' introductory overviews of the comments sufficiently show that the agencies considered "alternative options for meeting risk retention," as well as broader exemptions.  A.R. at JA2218 (79 Fed. Reg. at 77653).

[11] The plaintiff also asserts, without authority, that the SEC's separate analysis "cannot justify [the] joint order" because the other agencies did not expressly join it.  Pl.'s Reply, Ex. A (Pet'r'r's Reply) at 24.  However, the SEC only wrote separately in the final rule because "when making rules under the Exchange Act," the SEC must particularly "consider the impact on competition that the rules would have."  A.R. at JA2270 (79 Fed. Reg. at 77705) (citing 15 U.S.C. § 78w(a)).  Nevertheless, the joint nature of this proceeding suggests that the Court may examine this separate analysis insofar as it weighs on whether the agencies "failed to consider an important aspect of the problem."  State Farm, 463 U.S. at 43.

[12] The plaintiff reignites its argument that the agencies failed to adequately defend their approach for assessing levels of risk beyond what the plaintiff calls "the statutorily required level of credit risk" in arguing that open CLO
(continued . . . )

2.      **The SEC's Assessment of Costs and Benefits**

The plaintiff also asserts that the agencies inadequately assessed the costs and benefits

inherent in rejecting the alternatives proposed in the comments they received.  See Pl.'s Mot.,

Ex. A (Pet'r's Br.) at 54.  While no provisions in the governing statute specifically require a cost-

benefit analysis, the SEC has a separate obligation to "determine as best it can the economic

implications of [a] rule," Chamber of Commerce v. SEC, 412 F.3d 133, 143 (D.C. Cir. 2005),

and "to consider the effect of a new rule upon 'efficiency, competition, and capital formation,'"

Bus. Roundtable, 647 F.3d at 1148 (quoting 15 U.S.C. §§ 78c(f), 78w(a)(2)).  The defendants

contend that the SEC "fulfilled its statutory obligation in a separate section [of the final rule],"

Defs.' Mot., Ex. A (Resp'ts' Br.) at 59 (citing A.R. at JA2270–05 (79 Fed. Reg. at 77705–40)

("[the SEC's] Economic Analysis")), and further argue that the agencies collectively "considered

the rule's potential economic implications" when explaining "choices that Congress left to the

agencies' discretion," id.

The Court agrees with the defendants that the agencies gave an appropriate level of

consideration to the possible costs and benefits of the rules without an adjustment or exemption.

Although the plaintiff insists that the agencies—largely the SEC—improperly or inconsistently

weighed agency-acknowledged "decrease[s] in competition," "higher rates," and potential

negative fluctuations in the CLO market resulting from the final rule without adjustment of the

assessed benefits, Pl.'s Mot., Ex. A (Pet'r's Br.) at 54–55, the administrative record reflects a

sufficient foundation to which this Court may defer.  The SEC attempted to quantify the

unadjusted rules' impacts, despite existing data that likely failed to "provide a basis to fully

---

(. . . continued)

managers should have been granted an exemption or adjustment.  Pl.'s Reply, Ex. A (Pet'r's Reply) at 22.  But the
statute sets no such required level; instead, it sets a bare minimum.  15 U.S.C. § 78o-11(c)(1)(B)(i) (mandating that
regulations require retention of "not less than [five] percent of the credit risk") (emphasis added).

assess the rule's economic impact." A.R. at JA2270 (79 Fed. Reg. at 77705). The "lack of available data" and the dependence "on how sponsors, issuers, investors, and other parties . . . will adjust on a long-term basis," led the SEC to conclude that it could not truly quantify or predict specific economic effects. Id. Nevertheless, the SEC engaged in a lengthy and thorough analysis of the various applicable factors, id. at JA2270–95 (79 Fed. Reg. at 77705–30), and estimated "an approximately 14.8 percent reduction in supply of capital" to the pertinent market for CLOs, id. at JA2295 (79 Fed. Reg. at 77730). The SEC also confronted contrary findings submitted by commenters and explained the agencies' qualms with more costly estimates. See, e.g., id. at JA2292–93 (79 Fed. Reg. at 77727–28) (questioning and refuting "several assumptions" of a study submitted by Oliver Wyman, which claimed that "credit spreads will increase from 117 to 292 basis points and costs to borrowers will increase between $2.5 billion and $3.8 billion per year"). The SEC's estimations and its statutorily required consideration are entitled to the Court's deference because the SEC has clearly "apprised itself— and hence the public and Congress—of the economic consequences of a proposed regulation." Chamber of Commerce, 412 F.3d at 144. The decision to promulgate the final rule without an adjustment or exemption for open market CLO managers, despite this potentially negative effect on the CLO market, is entitled to deference because, "[d]espite the lack of data, the [SEC and the other agencies] had to promulgate a [ ] rule," and they "relied on Congress's determin[ation] that [the rule's] costs were necessary and appropriate in furthering the goals" of rehabilitating the securitization markets safely by requiring securitizers to keep sufficient skin in the game. See Nat'l Ass'n of Mfrs. v. SEC, 748 F.3d 359, 369 (D.C. Cir. 2014) (internal quotations and citations omitted), adhered to on reh'g Nat'l Ass'n of Mfrs. v. SEC, 800 F.3d 518 (D.C. Cir. 2015), overruled in part on other grounds by Am. Meat Inst. v. U.S. Dep't of Agric., 760 F.3d 18

(D.C. Cir. 2014); see also S. Rep. No. 111-176, at 128–29 (outlining Congress's intention to address the "'originate to distribute' model" and "[c]omplexity and opacity in securitization markets" by "aligning [securitizers'] economic interests with those of investors" by requiring them to "retain a material amount of risk").

The plaintiff's various arguments against the agencies' economic assessments amount to little more than attacks on the rules for any restriction of growth in the CLO market.  But the mere fact that the credit risk retention rules, without adjustment or exemption, would burden the CLO market to any degree cannot amount to agency fault; weighing the economic impact is a policy decision for Congress and the agencies to make, not the Court.  Cf. Pub. Citizen v. Nat'l Highway Traffic Safety Admin., 848 F.2d 256, 267 (D.C. Cir. 1988) (noting that a court must not "substitute [its] judgment for that of the agency as to the environmental consequences of its actions" because the court's "more limited role is to ensure, primarily, that no arguably significant consequences have been ignored; evaluating the 'impact' of those consequences . . . is 'left to the judgment of the agency'" (first quoting Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976), then quoting Sierra Club v. U.S. Dep't of Transp., 753 F.2d 120, 128 (D.C. Cir. 1985)). In this case, the SEC and the other agencies appropriately evaluated the costs and benefits, while refraining from questioning Congress's "basic premise" of requiring the adoption of credit risk retention rules to begin with, due to the failure of certain securitizations during the financial crisis, which necessitated the adoption of additional burdens in order to rehabilitate the market and reinstall investor confidence.  Nat'l Ass'n of Mfrs. v. SEC, 748 F.3d at 370; see also Pub. Citizen v. FTC, 869 F.2d 1541, 1557 (D.C. Cir. 1989) ("While agencies may safely be assumed to have discretion to create exceptions at the margins of a regulatory field, they are not thereby

empowered to weigh the costs and benefits of regulation at every turn; agencies surely do not have inherent authority to second-guess Congress' calculations.").

## IV.    CONCLUSION

The Court concludes that the final credit risk retention rules adopted by the defendants and the other agencies comply with the APA.  Despite the final rule's formulation and adoption by multiple agencies, the <u>Chevron</u> framework applies in this case, and the Court must defer to the agencies' reasonable interpretation of the term "securitizer" in the absence of any other defect in the agencies' rulemaking process.  Further, the agencies' gauging of credit risk through the use of "fair value" measurements for certain retention structures amounts to an appropriate interpretation of the statutory requirements, and the administrative record reflects that the agencies' conclusions on this topic were sufficiently reasoned in light of the relevant factors.  Finally, the agencies did not act arbitrarily, capriciously, or otherwise unlawfully in declining to provide an exemption or adjustment to the credit risk retention rules for open market CLOs.  Accordingly, the Court will deny the Plaintiff's Motion for Summary Judgment and grant the Defendants' Motion for Summary Judgment.

**SO ORDERED** this 22nd day of December, 2016.[13]

REGGIE B. WALTON
United States District Judge

---

[13] An Order will be issued contemporaneously with this Memorandum Opinion.